May it please the court. Good morning, your honors. Bethany Pander of Greenberg-Trarig, joined by my colleague Bill Michael, on behalf of the appellant, Robert Edward Maloney. A constellation of errors during the district court proceedings violated Mr. Maloney's self-representation, confrontation clause, and speedy trial rights guaranteed under the Sixth Amendment. The reasons. First, the district court abuses discretion in denying Mr. Maloney the right to represent himself in closing argument. Second, the court impermissibly limited the scope of cross-examination of the government's star witness. Third, the court erred in refusing to sanction the government for its repeated discovery violations. And fourth, for violation of Mr. Maloney's speedy trial rights. Bless you, your honor. Thank you. Go ahead. Turning to the first issue, the district court abuses discretion in denying Mr. Maloney's request to represent himself. This issue turns on context and timing. Even before the Supreme Court's ruling in Feretta v. California in 1975, it is well established that a criminal defendant has a constitutional right to represent himself. This right exists because it is the defendant who suffers the consequences if his defense fails. And this court has recognized even in United States v. Prucha in 2017, which the government cited in its briefing, that the Constitution does not force a lawyer upon a defendant. But that's exactly what the district court did here. One week before trial, during the pretrial conference, Mr. Maloney's counsel informed the district court that Mr. Maloney may like to represent himself at some point during the trial. Is that too vague? Because as you know, timeliness is the main answer by the other side. Is that too vague a request to do one part of the trial? No, your honor, because when we look at the record, when we look at the March 8th or March 28th, 2023 transcript at pages 3 and 4, the court went through with Mr. Maloney's counsel what exactly would happen if a mid-trial request was in fact to occur. So the court told Mr. Maloney that if he were to choose to represent himself, quote, in the midst of trial, that he would want him to fully understand what his rights were, and that the court would, quote, take a break, go through the rights that he has, and recommend that Mr. Maloney not represent himself. But the court was clear in telling Mr. Maloney that the decision would be, quote, totally up to him. And when the time came, the district court did not do what it said that it would. But at that point, though, the district court didn't have the sort of circumstantial, they didn't have the circumstances of and the context of in which he was asking. So it's sort of hard to, you know, bind the district court to a ruling in advance. It's almost like your argument is, look, he already ruled on it. And so, therefore, you've got to hold the district court to what he said before the argument is not that the district court made some preliminary ruling that it was held to. The court was entitled to engage in that balancing analysis and look at whether there would have been confusion or if there would have been delay. But when we look at the actual moment that Mr. Maloney invoked his right to represent himself, which was at closing argument, there was no indication in the record that there was going to be delay or disruption, which are the two factors that the court could have considered. What about, what I, my understanding of the district court's concern was that Mr. Maloney kind of wanted to testify, right? He had gone through a discussion about do I testify, do or not? I got the sense that there was concern about what he might be cross examined on. And that sort of seemed to be the, what he was offering up of what he wanted to get out to this jury, what he wanted to say to the jury. Why isn't that enough for the district court to say, look, you can't do that. You can't testify. And that's, that's a reason that, that we would be confusing the jury and it just wouldn't be appropriate. It's not enough, Your Honor, because when we look at the trial transcript at volume five at pages 849 and page 850, Mr. Maloney explained that while he was talking about the evidence that ultimately did not come in before the jury, that he understood the had spoken about some issues that were not in evidence, that the reason why he raised those was to show the court how important it was that he have the opportunity to speak for himself. Mr. Maloney was explaining why it was so important for him to be able to use his voice, which the government had referenced in its closing argument over 19 times, in order to present his own closing argument. And this is why the district court abused its discretion when it ultimately determined that it was too late. The court itself set the parameters for, for when Mr. Maloney would be able to represent himself. And when we look at this court's decision in the United States versus Smith in 2016, Smith teaches us that a trial court is required to tolerate occasionally wacky or even frivolous behavior at trial. Unless the defendant's conduct threatens to stall pretrial or trial proceedings, this court has recognized that district courts are required to respect a defendant's right to represent himself. And that includes the presentation of a defense to the bitter end. Counsel, is there a case that addresses closing argument and just closing argument? Not in this circuit, Your Honor, but we represent that when we look at Smith, Smith teaches us that. Yes, but now, now, now, now, I appreciate that. Other circuits, what's the closest case? The closest case, Your Honor, I think would be the 10th Circuit's decision in, let me see, in the United States, or excuse me, the 11th Circuit's decision in United States versus Lindstrom. Is it about closing argument only? No, Your Honor, it's not. Do you know of a case about closing argument only? I don't, Your Honor. Should we draw a bright line on closing argument being different than the rest of it? Because as you know, argument is not evidence. I can tell you all the conundrums and wise sayings. Should we draw a line on closing arguments? No, Your Honor, because a closing argument is a critical point of trial, and this court does not need to draw any new rule. This falls strictly within the Smith analysis that where a defendant is entitled to present its defense to the bitter end, that includes closing argument. So we would argue that there's no new rule that needs to be made here, just that based on the parameters that were set by the district court in the pre-trial proceedings, Mr. Maloney was denied his right to represent himself. And is bitter end the words of the Smith case? It is, Your Honor. That's a direct quote from Ian. Bitter end, okay, go ahead. To the bitter end. Okay, go ahead. Yes, Your Honor. Oh, ends, plural, did you say? To the bitter end. Yeah, thank you. Yes. And, Your Honor, but it wasn't a single error that impacted the trial. This leads me to my second issue. The district court violated Mr. Maloney's Confrontation Clause rights by impermissibly insulating the government's star witness, Sarah Lahr, from cross-examination. The appropriate test for the court to employ here is, had counsel been permitted to pursue the proposed line of cross-examination, that a reasonable jury might have had a significantly different impression of Ms. Lahr's credibility. That comes from this court's decision in United States v. Beckman in the year 2000. That test was satisfied here. The government's theory at trial was that Mr. Maloney conspired to distribute methamphetamine and that he directed a conspiracy using a code to discuss the distribution with others outside of custody on recorded calls. The government told the jury in opening statements Ms. Lahr would explain to the jury what she and the defendant were talking about in the, quote, many, many recorded calls. And the government had no evidence, and none was offered, that Mr. Maloney ever touched the methamphetamine at issue, and not a single phone call included a reference to methamphetamine, meth, or drugs. Ms. Lahr was the essential link to decode the innocuous phone calls and relay what allegedly happened with the proceeds of the drug sales. It was only her testimony that established that words like onions and elbows meant ounces and pounds of meth, and that reference to, for example, six pairs of Jordans that nobody's worn yet that are perfect meant six pounds of untampered, uncut methamphetamine, which as an aside was never recovered by the government, which the government conceded. Likewise, Ms. Lahr was the only witness who could explain what happened to the money that would have been generated from the methamphetamine distribution operation. The defense established that Mr. Maloney received only $600 from Ms. Lahr, despite being the apparent leader of the operation. It was Ms. Lahr's testimony alone that claimed Mr. Maloney had given the money to a third party to pay off a drug debt, and specifically, she testified on volume three of the trial transcript at pages 469 to 474 that she gave $30,000 to an unindicted third party who never testified. Without Lahr's testimony, the government had nothing more than innocuous phone calls and no way to connect Mr. Maloney with the money generated by the operation. This is why it was of pivotal importance for the defense to cross-examine Ms. Lahr's character for truthfulness. Counsel, if you're reaching for your water, you can get it from back there. Sure. I detected that, but I'm no detective worth anything normally. Go ahead. Thank you, Your Honor. So, to establish her habitual dishonesty, confusion, and willingness to insert herself into a criminal matter, the defense specifically sought to cross-examine Ms. Lahr regarding her repeated claims over time of being present during the kidnapping, sexual assault, and murder of Jacob Wetterling. Was there, in the proffer about that, was there a time frame of when she made those statements? Yes, Your Honor, and in the trial transcript at page, or at volume 3 at pages 521 and 565, it was established that during the relevant time frame that the recorded calls were being made that Ms. Lahr had made those statements to several individuals. Just during that, was that sort of agreed upon or just, was there any particular dates that were attached to those? No, Your Honor. Okay. But, this is why it matters that the district court did not allow Mr. Maloney's counsel to enter into this area of cross-examination. The district court recognized that these statements were, quote, far out, so fantastic, and a clear exaggeration, and that was at the addendum at page 36. These are all the markings of an area of cross-examination that would have given the jury a significantly different impression of Ms. Lahr's credibility. And, the district court abuses discretion in refusing to allow Mr. Maloney to enter into this area of cross-examination. How would that cross-examination have gone? It seems to me you would have had to have sort of presented the jury with the scenario of what happened with this particular case with this boy, and why it was so fanciful for her to claim that she was there, which is sort of kind of that mini-trial that courts are trying to avoid. Can you speak to that, how that wouldn't have been a distraction for the jury? Your Honor, in the district court and the government, all the parties conceded that because of the sensationalism and the very well-known nature of this crime, that it wouldn't have been an issue for needing to explain. The court was more concerned that everyone was so aware of the Jacob Wetterling statements that this would have somehow confused the jury. But showing that Ms. Lahr had instances of lying and then ruling that that is somehow not probative of her truthfulness just defies logic. The district court impermissibly restricted the scope of Ms. Lahr, and the government is the one that bears the burden to establish that this constitutional error was harmless beyond a reasonable doubt. And they can't meet that test. Counsel, you are into your rebuttal. Of course, you can use it now, but you can also reserve it. Thank you, Your Honor. I'll reserve. You may. Mr. Gendryk. Thank you, Your Honor. Good morning. David Gendryk on behalf of the United States. May it please the Court. I'll address the issues raised by defense counsel in the order in which counsel raised     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.        Thank you. Thank you. Thank you. The record the court has on the other issues raised in the briefs. With respect to the first argument and defendant's right to represent himself, the government agrees that context does matter. And both with respect to the context of the legal standard that applies here and the context of the proceedings below, it's apparent in the government's view that the district court did not abuse its discretion in denying the defendant the right to present a closing argument, which was first solicited and asked for after his defense attorney had already stood up and in front of the jury indicated that he was going to provide the argument. With respect to context on the law, counsel appropriately notes the defendant has a right to self-representation, but it's also established that that right is not absolute and is subject to the discretion of the trial court, particularly once trial begins. That exercise of discretion, as this court has consistently held, depends in part on the timeliness of the invocation of the right. The defense argues in its reply brief that untimeliness alone is not a basis to deny self-representation. Although, as I'll discuss in a moment, the context here went far beyond the untimeliness of the request, it's the government's read of this court's precedence that untimeliness alone would suffice. And it's not just based on the statement in Webster in a footnote that says the district court could have denied based only on untimeliness. That doctrine or that principle was carried through by this court both in the Pruka case, which is cited in the government's brief, but upon reviewing the defendant's reply, the government also looked for additional authority for that proposition. Although this is not cited in the government's brief, the United States v. Wright case, 682 Fed 3rd at 1082, the pin site is 1090, also cites that Webster proposition that untimeliness alone is a basis to deny a request for self-representation. Now I think it's a sliding scale if you are untimely by asking for the first day of trial versus untimely under the circumstances here, that's certainly a consideration for a district court. How many days of trial have gone on here? Well, I think the trial was five days and this was literally the last half hour of the fifth day. And counsel, have you found a case just like this? No, I have not seen any case where the request was made under these circumstances and this late. But you don't have one saying it's wrong to a right or anything? I'm not asking the court to declare that any request during closing is per se untimely and should not be honored. And that gets to the context in this particular case. First, the defense points out pre-trial proceedings and states in its reply brief that the defendant was given an unqualified right to represent himself at any time during trial. I think a careful reading of the transcript reveals that it wasn't unqualified and in fact the district court indicated to the defendant that should he invoke his right that there would be a FARETA hearing conducted. And of course, as this court is aware, as part of a FARETA hearing, there are at least two parts of that that bear on the circumstances here. One, a defendant has to agree to abide by the rule of evidence. And two, a defendant has to agree to abide by the rules of decorum of the court that are applicable to all attorneys. And those are precisely the two areas that the district court inquired of the defendant about at the time he made his invocation. Not only did the defendant not agree to abide by the rules of evidence under the government's fair reading of this record, but perhaps more importantly, the district court's reading of this record where he said, your invocations here of efforts to get evidence that's not before the jury, before them during argument, is quote, exactly the problem that I'm concerned about, close quote. At the conclusion of several back and forth where the district court sought to clarify with the defendant the fact that he could not present himself as evidence, the defendant nonetheless said, I'll tell them I'm a gang member. I'll tell them I spent my life in prison. In addition, with respect to decorum, your honors, he attacked not only the district court, he attacked the government and his own attorneys. He said his own attorneys had spoken for him on his behalf without his consent. He said the district court had bullied him, and he said the government had tampered with the evidence across all three dimensions. The defendant had displayed belligerence. What about the option of saying, all right, here are the rules, Mr. Maloney. You can only talk about what's in evidence from the trial, and there's no attacks on the parties involved. Now, give it a go, but if you veer off of that, it's done. Your honor, it's an abuse of discretion standard under review. I certainly wouldn't represent to the court that the district court could not have handled that way, but it certainly was not unreasonable or an abuse of discretion here to handle it exactly as the district court did. The standard is potential for disruption. The district court doesn't have to be certain that there'll be disruption. Had Mr. Maloney engaged in any kind of disruptive behavior during the course of the trial to that point? No. No, he had not. Unless the court had additional questions on the district court's sound exercise of its discretion with respect to the request to go pro se, literally as the trial was concluding, I'd move to the second issue raised by defense counsel. The second issue discussed was the district court's decision not to allow a single line of inquiry with respect to one of the government's witnesses. Here again, context matters, both with respect to the law and with respect to the facts at trial. I think it was helpful. I'd like to discuss just for a moment the standard review because I think it was helpful for defense counsel to point out in footnote one of its reply brief that this court has by district court. I think the defense is right that this court has formulated it in a number of different ways, sometimes applying a clear abuse of discretion plus prejudice standard and sometimes applying a de novo standard of review. I think however formulated, the principles reflected in this court's law that apply to the confrontation cause claim remain the same. Those principles include the fact that the right to conduct cross-examination is not unfettered. That a defense attorney does not get to conduct cross-examination that's effective in any way and to whatever extent the defendant may wish. That's a statement of the district court in the Supreme Court in the Fenster case. This court has repeatedly emphasized that the touchstone is an adequate opportunity to impeach and for reasons I'll discuss in a moment, the defendant here had more than an adequate opportunity to impeach Ms. Lahr. It's also a common thread throughout the court's holdings that a district court has wide latitude under the confrontation clause to impose reasonable limits on cross-examination including relevance, confusion of the issues as you mentioned Judge Kelly, and prejudice. So even if it's a de novo standard of review, this court recognizes that the district court retains wide latitude to make these sorts of trial related decisions. Here of course 608B and rule 403 were implicated and in the 403 context the on the spot balancing garners even additional deference from this court. Third, a defendant must demonstrate and the defense counsel cited this in argument, the defense must demonstrate, this is the defendant's burden, that a reasonable jury might have received a significantly different impression of witness credibility. Finally, then... Oh, I'm sorry. Yes, please. On that point, was there anything that she was cross-examined about that reached this sort of, I guess, magnitude of credibility that this line of questioning would have brought out? Well, I think the government, so no. I don't think there was anything that's fantastic or exaggerated in the cross-examination. But I think that demonstrates in part, Your Honor, the isolated and wholly separate nature of this single accusation. So had there been a series of accusations about misperceptions that bore either on her perception at the time of the conspiracy or on her ability to testify at trial, this may be a different case. And the Lindstrom case cited in the defendant's reply brief is such a circumstance. In Lindstrom, what the court, this is an 11th Circuit case from 1983. It's not precedential in this circuit. But in Lindstrom, the court noted that the disputed medical records suggested a history of psychiatric disorders manifesting themselves in violent threats and manipulative and destructive conduct bearing specific relevance to the facts at issue. And they cited three examples, a murder for hire contract, shooting a shotgun through a window, and faking a suicide to punish and manipulate the boyfriend. And the court explained in Lindstrom how those accusations and that consistent line of psychiatric difficulty bore specifically on the issues at trial. I think as your questions foreshadowed, Judge Kelly, this was an isolated incident not connected in time, either as to when it was spoken, but certainly not with respect to the Wetterling murder of a, as the defense acknowledges, a highly sensationalized murder in our district. As this court has emphasized, that where the Crawford cross-examination deals with an isolated event of a different character than the one at issue, it's not all that probative of the credibility of the witness. And that was certainly the case here. I would like to note that the defense in reply in here this morning has said that multiple witnesses observed this statement. But all the record reflects is that multiple witnesses heard her say it. That was the representation of the defense. But not whether it was on multiple occasions. In other words, whether two were present at once, or it was some multiple occasions or repeated pattern of conduct over a period of time. A minor point, but that's what the record reflects. With respect then to- So often in these circumstances, we have this regularly in the cases, the district judge lets them ask something that doesn't say the word Wetterling, but almost says that. You know, in the sensational murder, she claims she was present at the sensational murder or something like that. You'd agree that that would have been an acceptable course, right? Would it have been within the district court's 608 and 403 discretion? I don't think I would have here been appealing that ruling. It may have been sanitized, perhaps, but that wasn't requested by the defendant. No limiting instruction was requested. They wanted to cross-examine her on Wetterling, and the government's position is the reason for that is because it's a sensationalized case that had the potential to distract the jury. There wasn't any sort of half measure proposed by the defense, nor did they renew their request to cross-examine on the Wetterling matter after cross-examination was conducted. That's something this court looks at. Why is it relevant here in the context of this record? Because the ability to cross-examine Ms. Lahr was extensive. And I won't repeat the argument in the government's brief, but she was cross-examined with respect to her perceptions at the time of the conspiracy, the accuracy of her testimony, and her drug use and the effect of the drug use on her perceptions, all during cross-examination. As this court has said, the touchstone of an adequate opportunity to impeach was more than provided in this case. With respect to corroboration and the emphasis on the code, it's important to note that this is not a case where there was no encounter of methamphetamine by law enforcement. And at least three occasions, law enforcement corroborated that what Maloney was talking about was methamphetamine, separate from the, frankly, clumsy and quite transparent code he used during his conversations with Lahr. First, there was a controlled buy of methamphetamine made by R.L., a cooperating witness, in St. Cloud, which law enforcement surveilled, debriefed R.L. before and after the transaction, and recovered the methamphetamine that Lahr sold to R.L. So law enforcement was, in fact, in possession of methamphetamine that Lahr sold to R.L. That then was the discussion of a three-way call between Maloney, R.L., and Ms. Lahr, where Maloney concludes by saying, I don't care if you're in the back of the cop car, which of course implies something criminal was going on, I want you to count the money. The second occasion is that law enforcement recovered three pounds of meth from Garza, who testified at trial and separately and independently corroborated that Maloney was directing this methamphetamine conspiracy. So law enforcement was in possession of the three pounds of methamphetamine recovered from Garza. The fact that it wasn't six pounds or nine pounds or 19 pounds was discussed at trial with respect to how the methamphetamine was distributed and sold over time. The third time is after Garza's locker or trailer was searched. Law enforcement sends Garza's girlfriend in on R.L. and she provides money from drug proceed money to Lahr and Lahr gives her a half a pound of methamphetamine. So this case did not rely solely or even primarily on the code words. There was actual methamphetamine recovered on three occasions, entirely consistent not only with the testimony of Lahr and with the conversations of Maloney, but with the testimony of Garza and law enforcement's surveillance of this effort. What was the rebuttal evidence that the defense presented to attack Lahr's credibility? Yes, the defense called a witness, a high school friend, I believe, of the defendant who testified that he had an opportunity to spend time with Ms. Lahr after Garza had been released from state prison on the terroristic threats charge. So this is after the conspiracy. He had an opportunity to spend some time with Lahr and that based on his observations, his opinion was that she was not a truthful witness. As the government argued in its brief, if this court would ultimately decide that the district court, either under de novo or an abuse of discretion review, should have allowed this single inquiry, and the government strongly urges that the district court was right, that would go to whether the touchstone of adequate impeachment was otherwise satisfied. Okay. Yes, sir. Unless the court has other questions, I'll rest on the briefs. Thank you very much. Yes. Thank you for the argument. Ms. Pander. To clarify a few points from the government's argument. The government misunderstands Mr. Maloney's argument with respect to Ms. Lahr. The point is not only that the government's case was centered on this code, which was on these recorded telephone calls for which Ms. Lahr was the essential link that the jury needed in order to interpret that code. It was also that by the government's own argument, Lahr was the essential link to Garza. Lahr was the essential link to the entire distribution. She was present at the two controlled buys. So this is why she was that key witness where Mr. Maloney was entitled to have a full scope of cross-examination as to the government's star witness. The government referenced the confidential informant, R.L., but this court should not credit any of the information given by R.L. because he did not testify at trial. He was an unindicted and unidentified person who never testified, and the jury was instructed to not consider R.L.'s statements for their truthfulness. When we look at the first issue as to the speedy trial, or excuse me, not as to the speedy trial, as to the right to represent himself, the government cited United States v. Prucho, which is this court's decision in 2017. That case is entirely distinguishable from the case here because there the defendant, mid-trial, sought to represent himself but then represented to the district court that he was not prepared to proceed, which is the exact opposite as Mr. Maloney. Mr. Maloney was entirely present through the trial. He understood that he would only be allowed to discuss the matters that were put in evidence, and he, in fact, agreed to the district court that he would be invited to the court to restrict him even more than his lawyers. The government's serial failures at trial caused a constellation of issues that prejudiced Mr. Maloney. The court's judgment should be reversed, and at a minimum, this court should remand for a new trial. Thank you. Thank you both for the argument. Ms. Pander, thank you for your service under the Criminal Justice Act. Thank you. And Case No. 22-3419 is submitted for decision by the Court. Ms. O'Keefe.